# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# STATESVILLE DIVISION
# CRIMINAL ACTION NO. 5:21-CR-00044-KDB-DSC

| | |
|---|---|
| UNITED STATES OF AMERICA, | )<br>)<br>) |
| v. | ) **ORDER** |
| JERMAINE DOUGLAS GRANDY, | )<br>) |
| Defendant. | )<br>) |

**THIS MATTER IS BEFORE THE COURT** on Defendant's Motion to Suppress (Doc. No. 31). The Court has carefully considered the parties' briefs, exhibits, and oral argument on October 13, 2022. For the reasons discussed below, the Court will deny the Defendant's motion.

## I. BACKGROUND

On December 16, 2020, Caldwell County Sheriff's Office Drug Agent Troy Reynolds used a confidential informant and an undercover officer to conduct a purchase of fentanyl pills from a women known as K.K. (Doc. No. 38-1). The next day agents conducted a traffic stop and arrested K.K. after observing her perform a "hand-to-hand" drug transaction in the parking lot of a Caldwell County grocery store. *Id*. In her subsequent statement to law enforcement, K.K. identified Jermaine Grandy as a fentanyl pill source. Agent Reynolds knew Grandy because Agent Reynolds had purchased cocaine from Grandy as an undercover officer in 2017.

K.K. told law enforcement that she would purchase 100 fentanyl pills at $30 per pill from Grandy but had stopped dealing with him a couple of months earlier. *Id*. K.K. stated that she purchased pills from both Grandy's residence on Old North Road and at his mother's residence on Conley Place (both in Lenoir, NC). She also informed law enforcement that Grandy once told her

1

that he was going to Arizona to obtain fentanyl pills. K.K. further disclosed that she observed several firearms at Grandy's residence, saw Grandy with thousands of fentanyl pills, and observed Grandy with large amounts of U.S. currency. K.K. provided agents with Grandy's telephone number and agreed to cooperate with the agents.

In the presence of the agents, K.K. reached out to Grandy with the "intention" to purchase fentanyl pills. Yet her efforts failed. K.K. then contacted another number associated with Grandy, which Grandy's 18-year-old son, Nevaeh Grandy ("Nevaeh") answered. (Doc. No. 38-1). K.K. explained to Nevaeh she wanted to buy fentanyl from Grandy. After speaking with Nevaeh, Grandy called K.K. from his original phone number. *Id*. Despite her efforts, Grandy told K.K. that he would not deal with her. At all times, agents were in the room with K.K. monitoring these calls.

After K.K.'s post arrest release, she contacted Agent Reynolds. She advised him that she spoke with Grandy and discussed the possibility of purchasing 100 fentanyl pills, but Grandy wanted K.K. to work through a third party. However, agents wanted to deal directly with Grandy and therefore asked K.K to not make the purchase. On a later date, Grandy contacted K.K. about purchasing 50 pills, again through a third party. *Id*. Agents then met with K.K. and attempted to monitor a call with Grandy. Grandy would not answer so the agents asked K.K. to call the third party. The third party advised K.K. to call Grandy's son, Nevaeh. Eventually, before a controlled purchase could be made, Grandy sent K.K. text messages asking why it always took hours for her to call him back and stating that he would harm her whole family if he discovered she was attempting to set him up. Following these threats, agents asked K.K. not to further contact Grandy.

Agents subsequently identified Grandy's residence at 1614 Old North Road in Lenoir, but learned it was titled under Nevaeh's name. Yet agents were unable to surveil Grandy's residence because the house was at the end of a long-gated road. *Id*.

On January 5, 2021, agents conducted an interview with a confidential source in the Caldwell County Jail. (Doc. No. 38-1). The confidential source explained that he used fentanyl pills and made purchases from a supply source through a third party. The source stated that he would pick up from the third party and both would meet with an individual known as "Knowledge" and purchase the pills. Agents knew Grandy's alias was "Knowledge" and showed this source a photo of Grandy. *Id.* The source positively identified Grandy as "Knowledge" and told agents that he had learned Grandy was going to Arizona for 250,000 fentanyl pills.

On January 8, 2021, Agent Annas with the Lenoir Police Department notified Agent Reynolds about his recent conversation with another confidential source. This source saw Grandy with a large amount of "dirty 30's" and multiple firearms inside the residence on Old North Road. *Id*. Agents knew "dirty 30's" was a street name for fentanyl pills.

That same day, Agent Reynolds viewed Grandy's "Facebook" page and observed photographs and a video of Grandy with a backpack full of U.S. currency, making purchases of jewelry with Nevaeh, and paying $1,900.00 for one night in a Texas hotel. Agents ran a wage history for Grandy and Nevaeh and discovered that Grandy had not filed taxable wages since 2017 and Nevaeh never had any taxable wages. Further, even though Grandy had no vehicles registered to him, agents discovered that he was known to drive a Ford Raptor truck and an AMG Mercedes Benz SUV. *Id*.

On January 11, 2021, Agent Reynolds applied for authorization to install a tracking device on the telephone service being used by Grandy. *See* Doc. No. 31-1. In his supporting affidavit, Agent Reynolds stated that Grandy was a fugitive from justice "and/or" the target of an ongoing criminal investigation and there was probable cause to believe that Grandy was distributing fentanyl in violation of North Carolina law. *Id*. Agent Reynolds laid out what he believed to be

3

probable cause in twelve separate paragraphs and in chronological order. These paragraphs contained: (1) the information law enforcement obtained from K.K. and the confidential sources; (2) the information obtained by the viewing of Grandy's Facebook page; and (3) Grandy's tax history. *Id*. A North Carolina Superior Court Judge signed an order authorizing 30 days' worth of prospective GPS and Geo-Location data on the phone number identified with Grandy as well as the use of the pen register and 30 days' worth of historical cell site location data. For third-party data, the state order authorized the collection of historical information but did not authorize the collection of the content of any phone calls or text messages, the use of the pen register/trap and trace device, or prospective PS and Geo-Location data. *Id*.

On January 14, 2021, agents discovered that there was a 2018 Mercedes Benz GLE 63A, with the last four digits of its license place being 8922, at Grandy's residence at Old North Road. Agents determined the registered owner of the Mercedes was Jasmine Corpening, who was later determined to be Grandy's girlfriend.

On February 10th, agents learned that Grandy's phone was en route to Texas and located a 2018 Mercedes Benz GLE 63A with North Carolina license tag HKM-8922 in Texas via a license plate reader. Agent Reynolds then appeared before a North Carolina Superior Court Judge with an application for another tracking order. This application contained the same information as the previous application along with the information on phone pings and the license plate reader that appeared to show Grandy driving through Texas. The state court judge signed the second state order authorizing 30 days' worth of prospective GPS and Geo- Location data on Grandy's cell phone number as well as the use of the pen register and 30 days' worth of historical cell site location data. For third-party data, the order again only authorized the collection of historical information.

That evening, a license plate reader located the 2018 Mercedes Benz GLE 63A in Arizona. Agents then observed that the phone's location stayed in Arizona for about 24 hours and then began returning towards North Carolina. Agents tracked the phone stopping at a Texas jewelry store, a dentist office, and overnight lodging. Consequently, Agent Reynolds prepared a North Carolina search warrant for the 2018 Mercedes Benz GLE 63A and for Grandy, Jasmine Corpening, and/or any other occupant, which a North Carolina Magistrate Judge authorized. *Id*.

When the 2018 Mercedes GLE 63A approached the Caldwell County line on February 14th, Catawba County Sheriff's Office Investigator Dylan Scism observed the vehicle travel around 70 mph in a 55-mph zone as well as drive through a red light. Caldwell County Sheriff's Office deputies stopped the vehicle in Granite Falls. Nevaeh was driving the vehicle, Grandy was in the front passenger seat, and another individual was in the back seat. Deputies walked a K-9 around the vehicle, which gave a positive alert to the presence of the odor of narcotics. Agents then transported the vehicle to the Caldwell County Sheriff's Office for a more detailed search.

During the search of the vehicle, agents found: (1) approximately 36,000 dosage units of suspected fentanyl wrapped in 14 tape wrapped bundles in the air vent under the hood; (2) a Springfield 9mm pistol in the driver's side door; (3) a Ruger 9mm pistol in the back seat; and (4) a Glock 9mm pistol in the center console. After the search, Grandy waived his *Miranda* rights and provided an interview to the agents. Grandy admitted traveling to Arizona and purchasing the approximately 36,000 pills in the hood of the vehicle. Grandy provided information on how many times he traveled to Arizona and purchased pills, the amounts he purchased, how much he paid, and how much he owes to his sources of supply. (Doc. No. 38-1).

Agent Reynolds later applied for a search warrant for the residence at 1614 Old North Road, which was authorized. From the search, agents found and seized a money counter, a vacuum

sealing machine, two digital scales, a firearm in a box in the living room, and a large gun safe. Grandy then provided agents with the passcode for the safe. Agents subsequently seized approximately 27 firearms, which included semi-automatic rifles and handguns. Agents also recovered assorted ammunition and approximately 79 firearm magazines. Agent Annas applied for a search warrant for the residence at 715 Conley Place, and under that warrant agents located a safe with approximately 16.5 grams of suspected fentanyl pills and $1,449.00 in U.S. currency.

A federal grand jury charged Grandy with conspiracy to distribute fentanyl in violation of 21 U.S.C. § 841(a)(1)(b)(1)(A), possession with intent to distribute fentanyl in violation of 21 U.S.C. § 841(a)(1)(b)(1)(A), possession of one or more firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c), and unlawful possession of firearms by a felon in violation of 18 U.S.C. § 922(g). *See* Doc. No. 1. Grandy has now moved to suppress all property seized as a result of the searches, seizures, arrest, and any subsequent evidence or statements alleging that his Fourth Amendment rights were violated. *See* Doc. No. 31.

## II. DISCUSSION

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures... and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The fundamental goal of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.'" *Carpenter v.*

*United States*, 138 S. Ct. 2206, 2213 (2018) (quoting *Camara v. Municipal Court of City and Cnty. of San Francisco*, 387 U.S. 523, 528 (1967)).[1]

The "ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). The Supreme Court has determined that "[w]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, ... reasonableness generally requires the obtaining of a judicial warrant" *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995). "Such a warrant ensures that the inferences to support a search are 'drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.'" *Riley v. California*, 134 S. Ct. 2473, 2482 (2014) (quoting *Johnson v. United States*, 333 U.S. 10, 14 (1948)).

Grandy argues that law enforcement violated his Fourth Amendment Rights, requiring suppression of all evidence. First, Grandy maintains that officers conducted unlawful searches by obtaining cell phone tracking orders that allowed for the monitoring of Grandy's private movements, without probable cause that he was using his cell phone to travel to traffic fentanyl. Second, Grandy argues that the tracking orders were too broad and lacked particularity because the orders authorized multiple law enforcement agencies to collect the historical records, including GPS location history, of any person who called Grandy from their own phone. And lastly, he contends the tracking orders are invalid because Officer Reynolds omitted material pieces of information from the affidavits that would have defeated a finding of probable cause. The Court will address each argument in turn.

---

[1] An individual has a legitimate expectation of privacy in the record of his physical movements as captured through cell site location information. *Carpenter*, 138 S. Ct. at 2217. In *Carpenter*, the Court held that acquisition of cell site location information constitutes a search under the Fourth Amendment and that the government must generally obtain a search warrant, supported by probable cause, to obtain use of it. *Id.* at 2217.

1. <u>Probable Cause for the Tracking Orders</u>

When evaluating if probable cause supported the issuance of a warrant, a court assess the "totality-of-the-circumstances," including the "'veracity' and 'basis of knowledge' of persons supplying hearsay information." *Illinois v. Gates*, 462 U.S. 213, 238–39, (1983). A court's review should be "flexible" and not "hypertechnical," but the affidavit "must provide the magistrate with a substantial basis for determining the existence of probable cause." *Id.* at 236, 239. And "wholly conclusory statement[s]" fail to meet this standard. *Id.* at 239. Sufficient information must be presented to the magistrate to allow for the exercise of independent judgment. *Gates*, 462 U.S. at 239. "When reviewing the probable cause supporting a warrant, a reviewing court must consider only the information presented to the magistrate who issued the warrant." *United States v. Wilhelm*, 80 F.3d 116, 118 (4th Cir. 1996).

Both the January 1, 2021, and February 10, 2021, tracking order relied on essentially the same information.[2] The four pieces of evidence outlined in Agent Reynold's affidavit were: (1) the information obtained from K.K.; (2) the information learned through two confidential sources; (3) Grandy's criminal history; and (4) Grandy's Facebook postings. The question is therefore whether these pieces of information together, under a totality of the circumstances assessment, provided a substantial basis for determining the existence of probable cause. As discussed below, the Court finds that there was sufficient evidence to support the state court judges' determination of probable cause.

---

[2] The February 10, 2021, tracking order relied on the same information as the January 11, 2021, application, with the added information that Grandy appeared to be driving to Texas because his phone pinged in several states in route to Texas and agents located the vehicle Grandy was operating in Texas via a license plate reader. *See* Doc. No. 38-1, p. 5.

8

Law enforcement presented information from multiple sources that Grandy engaged in the selling and transportation of fentanyl. K.K. told law enforcement that she had bought 100 fentanyl pills from Grandy, that she had seen Grandy with thousands of fentanyl pills and thousands of dollars in cash, and that she had obtained her fentanyl from Grandy until a couple of months before her statements. K.K. also informed the agents that she had bought fentanyl at Grandy's residence and his mother's residence, provided them Grandy's phone number, and stated that Grandy had told her that he was traveling to Arizona to get fentanyl pills. Agents also monitored phone calls between K.K., Nevaeh, and Grandy. Law enforcement listened in when Grandy called K.K. and they discussed K.K.'s "need" to make a purchase from Grandy. Although Grandy told K.K. that he would not deal with her, this call established that there was a preexisting relationship between K.K. and Grandy. Grandy never denied knowing K.K. or not being involved with the sale of fentanyl. He simply stated he did not want to deal with K.K. Grandy later offered to have K.K. make her purchase through a third party and threatened to harm her whole family if she set him up. In sum, this information, along with the fact Agent Reynolds knew Grandy from having made an undercover purchase of cocaine from him in 2017, sufficiently established the veracity and knowledge of K.K.'s information.

K.K.'s information was also corroborated by the confidential sources. A confidential source identified Grandy as someone who sold fentanyl and heard that Grandy was going to Arizona to pick up 250,000 fentanyl pills. Another confidential source had recently told law enforcement that he had been to Grandy's residence and had seen thousands of "dirty 30 pills" (fentanyl) and multiple guns. Therefore, in applying for the warrants, law enforcement relied on three different, consistent sources to identify Grandy as a supplier of fentanyl. Two of these sources

9

stated that they had seen large quantities of fentanyl and multiple firearms at Grandy's residence and that Grandy traveled to Arizona to obtain the fentanyl.

In addition to the information obtained through K.K. and the confidential sources, Agent Reynolds also stated in his affidavit that "Caldwell County Narcotic's Agents are familiar with Jermain Douglas Grandy from a previous narcotics case" and that in 2017, he "made a[n] undercover purchase of cocaine from Grandy from an introduction to a confidential informant." Reynolds noted that "this case . . . is still pending in court." Agent Reynolds also stated that Grandy has pleaded guilty to "Felony Possession Sch 5, Possess of Firearm by Felon, Speeding 106/65 MPH Zone, Assault Govt Official/Empl, Felony Possession of Cocaine, Elude Arrest MV[greater than or equal to] 3 Agrv Fctrs, Reckless Driving to Endanger, PWISD Cocaine, Breaking and or Entering Felony, and Larceny of Motor Vehicle Felony." *See* Doc. No. 38-1. Grandy argues that the failure to list the date of those convictions, some of which occurred more than 10 years ago, supports a finding that the warrants lacked probable cause. Although undated previous convictions alone may be insufficient to establish probable cause, these convictions, along with the other information provided in the affidavits, support a finding of probable cause. These convictions show a pattern of prior drug-related criminal behavior that is relevant as part of a totality of the circumstances assessment.

Additionally, law enforcement witnessed on Facebook a photograph of a Texas hotel bill that cost $1,900 a night and a video of Grandy and his son buying custom jewelry with a backpack full of cash. Agents confirmed that Grandy had not reported taxable wages since 2017 and his son had never reported any taxable wages.

Grandy argues that the material from Facebook, as well as the information from the confidential sources, were stale. Time is a "crucial element of probable cause." *United States v.*

10

*McCall*, 740 F.2d 1331, 1335, 1337 (4th Cir. 1984). "A valid search warrant may issue only upon allegations of 'facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.'" *Id.* at 1335-36 (quoting *Sgro v. United States*, 287 U.S. 206, 210-11 (1932) (further citations omitted)). "[E]vidence seized pursuant to a warrant supported by 'stale' probable cause is not admissible in a criminal trial to establish the defendant's guilt." *Id.* at 1136. Grandy correctly notes the applications for the tracking orders state that law enforcement learned the information from the confidential sources on January 7, 2020, and January 8, 2020, which was more than a year before the order was signed on January 11, 2021, and that the statements from the confidential sources do not state when the alleged criminal activity took place. If this information was over a year old, then it may have been too remote in time to establish probable cause. Yet this argument fails because the information was not over a year old. Rather, Agent Reynolds simply made a typographical error related to the year of the interviews and the Facebook observation. The affidavits mistakenly state each event was conducted in January 2020, when, in fact, they were conducted in January 2021. *See* Doc. No. 38-1, p. 4. Additionally, the fact that the confidential sources did not state when their interactions with Grandy took place is not fatal to the probable cause analysis. Even assuming the confidential sources' underlying information was stale, K.K.'s recent corroborative information refreshed the confidential source's information. *See United States v. Rubio*, 535 F. App'x 251, 255 (4th Cir. 2013) ("Where recent information corroborates otherwise stale information, probable cause may be found.") (quoting *Emery v. Holmes*, 824 F.2d 143, 149 (1st Cir. 1987)); *see e.g.*, *United States v. Lemont Jerrone Webb*, No. 5:15-CR-172-BO-1, 2017 U.S. Dist. LEXIS 52704, at *32 (E.D.N.C. Apr. 6, 2017).

Moreover, when viewing the probable cause paragraphs, in context, it is clear that Agent Reynolds intended 2021 not 2020. Agent Reynolds begins by noting the investigation launched on

11

December 17, 2020, when agents spoke with K.K. *See* Doc. No. 31-1. Agent Reynolds then chronicles the information K.K. provided law enforcement and the next steps of the investigation. *Id*. While Agent Reynolds does mention a 2017 incident that establishes his knowledge of Grandy, this interlude does not disturb the overall timeline of events. Agent Reynolds immediately returns to his discussion of K.K. and the investigation. *Id*.

In sum, the information was not stale and when viewed in context, it would be clear to an attentive reader that Agent Reynolds made a typographical error.

At bottom, the Court finds after assessing the totality of the circumstances both the January 10, 2021, and February 14, 2021, tracking orders were supported by probable cause. Law enforcement obtained information from three separate sources that implicated Grandy in the sale of fentanyl, all of which were consistent and corroborative of each other. Also, agents themselves monitored phone calls with Grandy that discussed the potential sale of fentanyl. And lastly, Grandy's criminal history and Facebook posts further solidified law enforcement's probable cause.

2. The Alleged Overbreath of the Tracking Orders

The Fourth Amendment prohibits general search warrants and requires that a warrant describe with particularity the place to be searched and the things to be seized. U.S. Const. Amend. IV. This particularity requirement protects persons against the government's indiscriminate rummaging through their property and prevents the searching for and seizure of items that there is no probable cause to believe are either contraband or evidence of a crime. *See Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). "By limiting the authorization to search to the specific area and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications and will not take on the character of the wide-ranging

12

exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

Grandy argues that the tracking orders at issue were effectively general warrants that allowed officers to conduct unlawful wide ranging exploratory searches. He claims "[t]he tracking order for Mr. Grandy's phone authorized not only the collection of his own historical call detail records with cell site information and GPS history, but the tracking order also allowed multiple law enforcement agencies, including the Nebraska state police and the New Hanover County Sheriff's Office in the Eastern District of North Carolina, to collect the historical records, including GPS history, of any person who called Mr. Grandy from their own phone." *See* Doc. No. 31.

However, suppression is proper only if the defendant's own rights are violated. *United States v. Paynor,* 447 U.S. 727, 731, 735–37 (1980). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas v. Ill.,* 439 U.S. 128, 134 (1978); *see also United States v. Wilford*, 689 F. App'x 727, 730 (4th Cir. 2017) (holding defendant "lacks standing to challenge the use of the cell-site simulator" that was used to obtain information about his coconspirator's cell phone). The portions of the tracking warrants which Grandy argues are overbroad concern the collection of information from third-party telephone numbers. As a result, Grandy lacks standing to contest the warrants because

13

his rights were not violated, and he cannot attempt to vindicate the Fourth Amendment rights of a third party.[3,4]

3. Omitted Material Information

Grandy also argues that Agent Reynolds omitted material information from his applications and therefore his presence at a *Franks* hearing is required. In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court held that the Fourth Amendment entitles a defendant to challenge the validity of a search warrant affidavit if the defendant makes a substantial preliminary showing that the affidavit contains intentionally or recklessly false statements and the affidavit purged of its falsities would be insufficient to support a finding of probable cause. *See also United States v. Colkley*, 899 F.2d 297, 300-1 (4th Cir. 1990) ("If a *Franks* hearing is appropriate and an affiant's material perjury or recklessness is established by a preponderance of the evidence, the warrant 'must be voided' and evidence or testimony gathered pursuant to it must be excluded." (quoting *Franks*, 438 U.S. at 156)). Warrant affidavits are presumed to be valid and "allegations of 'negligence or innocent mistake'" are insufficient to support a hearing. *United States v. McKenzie-*

---

[3] Even if the challenged portions of the warrant were overbroad, this "'does not doom the entire warrant; rather, it requires the suppression of evidence seized pursuant to that part of the warrant…but does not require the suppression of anything described in the valid portions.'" *United States v. Hanna,* 661 F.3d 271, 286 (6th Cir. 2011) (quoting *United States v. Greene*, 250 F.3d 471, 477(6th Cir. 2001)); *see United States v. Cobb,* 970 F.3d 319, 330 (4th Cir. 2020) (applying severance doctrine), *cert. denied,* 141 S. Ct. 1750 (2021); *United States v. Sells*, 463 F.3d 1148, 1151 n.1 (10th Cir. 2006) (recognizing "every federal court to consider the issue has adopted the doctrine of severance, whereby valid portions of a warrant are severed from the invalid portions and only materials seized under the authority of the valid portions . . . are admissible"). Moreover, the United States represents to the Court that it did not obtain historical records from any third-party who called Grandy, and it does not seek to admit such evidence at trial. There is therefore no such evidence to suppress even if Grandy had standing to contest these portions of the warrant. *See* Doc. No. 38, p. 15.

[4] The Nebraska State Police and the New Hanover County Sheriff's Office in the Eastern District of North Carolina did not collect any information under these orders and were only listed as back-ups in case the SBI's server experienced technical difficulties. *See* Transcript of Motion Hearing, October 13, 2022.

*Gude*, 671 F.3d 452, 462 (4th Cir. 2011) (quoting *Franks*, 438 U.S. at 171). A *Franks* hearing also is unnecessary where, after removing the allegedly false statement, the truthful portions of the warrant application still support probable cause. *United States v. Friedemann*, 210 F.3d 227, 229 (4th Cir. 2000).

Grandy contends that he can make the required substantial preliminary showing to require a *Franks* hearing based on: (1) the affidavit erroneously suggesting that Grandy was a "fugitive from justice"; (2) the affidavit's omission of the dates of Grandy's criminal convictions (which occurred many years ago) ; and (3) Agent Reynolds' omission from the February 10, 2021, tracking order application that K.K. had been arrested for selling fentanyl on January 28, 2021. Grandy maintains given these alleged shortfalls, the connection between Grandy's phone and the alleged crimes was too tenuous to support a finding of probable cause. However, the Court finds that a *Franks* hearing is not warranted.

First, in Agent Reynolds's affidavit, he states that Grandy "is a fugitive from justice *and/or* is the subject of an ongoing criminal investigation being conducted by the Caldwell County Sheriff's Office, and there is probable cause to believe that Jermain Douglas Grandy committed the offense." *See* Doc. No. 31-1. This standard language was not a false or material misstatement, and both the affidavit and the order make clear that the information was sought because Grandy was the subject of an ongoing criminal investigation. Second, while the affidavit only noted the date of Grandy's pending drug case, the failure to include the dates of his prior convictions was not false and did not mislead the state court judges. The affidavit did not falsely represent that the convictions were recent. In fact, the number of convictions make clear that they took place over a period of time. And lastly, the fact that Agent Reynolds omitted from the February 10, 2021, tracking order application that K.K. had been arrested for selling fentanyl on January 28, 2021,

does not require a *Franks* hearing. Agent Reynolds did not provide any intentionally or recklessly false information in the February 10 application. Moreover, a state court judge found probable cause to support the January 10, 2021, tracking order, which included information on K.K.'s history of selling drugs. The application makes clear K.K. was a known drug dealer and therefore it would be unsurprising that she was arrested again. Consequently, the fact she was arrested again on drug charges would likely not have changed the court's probable cause determination. In short, the Court finds that Agent Reynolds did not omit material information from his applications and thus a *Franks* hearing is unwarranted.

   4. Good Faith

Finally, law enforcement's good-faith execution of the warrants requires denial of the motion. While evidence seized in violation of the Fourth Amendment is generally subject to suppression under the exclusionary rule, *see United States v. Calandra*, 414 U.S. 338, 347-48, 94 S. Ct. 613, 38 L. Ed. 2d 561 (1974), the Supreme Court held in *United States v. Leon*, 468 U.S. 897, 922 n. 23 (1984), that suppression of evidence is inappropriate, even when the Court finds a warrant invalid, unless "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." Therefore, the "mere insufficiency of the affidavit to support probable cause will not preclude the application of the *Leon* good faith exception." *United States v. Doyle*, 650 F.3d 460, 470 (4th Cir. 2011).

The good-faith exception does not apply in four circumstances in which an officer cannot be found to have acted with "objective reasonableness": (1) when the affiant based his application on knowing or reckless falsity; (2) when the judicial officer wholly abandoned his role as a neutral and detached decision maker and served merely as a "rubber stamp" for the police; (3) when the affidavit supporting the warrant was so lacking in indicia of probable cause as to render official

16

belief in its existence entirely unreasonable; and (4) when the warrant was so facially deficient that the executing officers could not reasonably have presumed that the warrant was valid.. *Doyle*, 650 F.3d at 467 (quoting *United States v. DeQuasie*, 373 F.3d 509, 519–20 (4th Cir.2004)).

Grandy argues that Agent Reynolds' "material omissions from the applications, the complete lack of probable cause, and the facial overbreadth of the warrant support that the good faith exception should not apply." *See* Doc. No. 31, p. 31. The Court disagrees. None of the *Leon* circumstances exist here. First, Agent Reynolds did not provide, and the findings of probable cause were not based on, statements that were knowingly or recklessly false. Second, the tracking orders were reviewed and authorized by North Carolina Superior Court Judges, who assessed the facts and governing law and concluded that probable cause existed. No evidence supports the argument that these judges abandoned their neutral roles and acted as a "rubber stamp" for law enforcement. Third, the affidavits supporting the warrants were not so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. The information was obtained from three known informants, the informants corroborated each other's information, and law enforcement supplemented the information by their own investigation. And finally, the warrants were not facially deficient. They describe with specificity the subject of the warrant, the data to be searched and collected, and the items to be seized.

In sum, even assuming the warrants were not supported by probable cause (which the Court finds they were), suppression of evidence would be inappropriate. The Court finds Agent Reynolds, and law enforcement, acted with an objectively reasonable belief that the searches under the tracking orders were supported by probable cause.

**NOW THEREFORE IT IS ORDERED THAT** Defendant's Motion to Suppress, (Doc. No. 31), is **DENIED.**

17

Signed: October 18, 2022

*Kenneth D. Bell*
United States District Judge